IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RUSH INDUSTRIES, INC.,          )
                                )
               Plaintiff,       )
                                )
          v.                    )        1:08-cv-810
                                )
MWP CONTRACTORS, L.L.C. and     )
BRANN'S TRANSPORT SERVICE,      )
INC.                            )
                                )
               Defendants.      )
                                )

**<u>MEMORANDUM OPINION AND ORDER</u>**

THOMAS D. SCHROEDER, District Judge.

Plaintiff Rush Industries, Inc. ("Rush Industries") brings
this action against Defendants MWP Contractors, L.L.C. ("MWP"),
and Brann's Transport Service, Inc. ("Brann's"), for damage to a
piece of industrial equipment shipped from South Boston,
Virginia, to Americus, Georgia. Rush Industries originally
filed this action in the General Court of Justice, Superior
Court Division, of Guilford County, alleging breach of contract,
bailment, and negligence. Defendants timely removed the action
to this court on the ground that Rush Industries' claims are
preempted and governed by the Carmack Amendment to the
Interstate Commerce Act, 49 U.S.C. § 14706 <u>et</u> <u>seq.</u> (Doc. 1), and
Defendants have filed cross-claims for any damages the court

awards.  In addition, MWP has counterclaimed against Rush Industries for amounts allegedly due for service and shipment of the equipment.  (Doc. 8.)

On Defendants' motions for summary judgment, the court previously dismissed Rush Industries' claims for lost profits against both Defendants.  (Doc. 37 at 11.)  Additionally, the court dismissed Rush Industries' claims for negligence to the extent they did not arise out of the alleged bailment.  (Id.)

Rush Industries' remaining claims were tried to the court on October 22 and 23, 2012.  At trial, Rush Industries presented one witness, Michael Rush, its president.  MWP presented the testimony of Roger Criner, a former employee of DelMac Machinery Group, who had previously serviced and was familiar with the equipment at issue; Nesbit "Chip" Osborne King, Jr., MWP's sole owner; Tony David Ellis, an electrician with MWP; and Anthony Wilson, an MWP superintendent.  Brann's called Keith Brann, its president.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact and conclusions of law.  To the extent any factual statements are contained in the conclusions of law, they are deemed findings of fact as well.

I.  FINDINGS OF FACT

The court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of

2

witnesses, and the inferences that the court has found reasonable to draw from the evidence.

1. Plaintiff Rush Industries is a North Carolina corporation with offices in Greensboro, North Carolina, and Americus, Georgia. Plaintiff is in the business of, among other things, furniture and wood component parts manufacturing and distribution.

2. Defendant MWP is a limited liability company organized and existing under the laws of the state of North Carolina, having its principal place of business in Roxboro, North Carolina. MWP's business includes the removal, shipment, and installation of major mechanical equipment.

3. Defendant Brann's is a corporation organized and existing under the laws of the state of North Carolina, having its principal place of business in Roxboro, North Carolina. Brann's provides transportation services as a motor carrier.

4. In late 2006, Rush Industries purchased a Gabbiani Delta LT-TE Programmable Rear Load Panel Saw with Scoring ("the panel saw" or "saw") through an internet auction held by Industrial Recovery Services. (See Plaintiff ("Pltf.") Ex. 1.) Rush Industries intended to use the panel saw in its furniture and wood component parts manufacturing business. Pursuant to the terms of the auction, there was a twelve-day inspection period during which prospective bidders were allowed to inspect

3

the panel saw. (Pltf. Ex. 3.) Rush Industries did not inspect the saw during this period or prior to placing its bid.

5. Rush Industries' winning bid for the panel saw was $13,000. Combined with a 10% commission to the auctioneer, the total purchase price was $14,300. The bill of sale provides that Rush Industries purchased the saw "AS IS, WHERE IS, WITH ALL FAULTS" and without any warranty or representation. (Pltf. Ex. 2.)

6. At the time it was purchased by Rush Industries, the panel saw, which has a footprint of approximately 35 feet by 18 feet, was installed at a facility in South Boston, Virginia. The facility was owned by D-Scan, a division of Masco, and was no longer in active operation.

7. The panel saw was originally made overseas and is one of only a handful of its type made by the manufacturer. It was twelve-to-thirteen years old at the time it was purchased by Rush Industries. The panel saw's computer controller was also twelve-to-thirteen years old, and although the monitor had been replaced in more recent years (when one was found in England), the computer was obsolete given the advances in computer technology. The panel saw had "a lot of wear and tear" in the mechanical portion of the machine. According to Mr. Criner, who had previously serviced the saw and whom the court finds credible, the panel saw's original useful life was ten to twelve

4

years, and the computer's original useful life was eight to ten years. Consequently, the panel saw was beyond its expected useful life at the time Rush Industries purchased it.

8. After purchasing the panel saw, Mr. Rush, the sole owner and president of Rush Industries, traveled to the D-Scan facility on December 5, 2006, to inspect the saw and arrange for its shipment to his business. During this trip, Mr. Rush was accompanied by his wife, Vicky, and two representatives associated with MWP (an MWP employee and an MWP consultant).

9. While at the D-Scan facility, Rush Industries videotaped the panel saw being turned on and operated by a D-Scan employee. (Pltf. Ex. 25.) The video shows the saw loading, staging, and cutting boards with no apparent difficulty. Additionally, the video shows the operator programming the saw's computer, which displays schematics based on the inputted board size. Following this demonstration, Vicky Rush and the D-Scan operator measured the boards cut by the panel saw and confirmed that they were cut to the appropriate dimensions.

10. While at the D-Scan facility, Mr. Rush also discussed with D-Scan personnel the possibility of receiving the customized duct work for the panel saw's dust collection system, as well as some tools and spare parts. D-Scan agreed to include these materials in the purchase. MWP's representative overheard

5

this discussion, and Mr. Rush believed that MWP would move these materials, along with the panel saw, if MWP was awarded the shipping contract.

11.  On December 7, 2006, Rush Industries accepted MWP's written proposal to ship the panel saw from South Boston, Virginia, to Rush Industries' manufacturing plant in Americus, Georgia.  (Pltf. Ex. 9 (the "Agreement").)  The following terms were included in the Agreement:

<blockquote>

a.  MWP would disassemble, package, stage, and load trucks for shipment of "panel saw" to Americus, Georgia, for a fixed price of $4,000.

b.  Shipping would be "coordinated by MWP" at the cost of $1,300 per load, with an estimate of one load.

c.  MWP would unload and assemble the panel saw at the point of delivery for a fixed price of $4,000.

d.  MWP's work relating to the start-up of the panel saw would be billed on a time and material basis, with millwright/mechanical services at $35.00/man hour and electrical technician services at $50.00/man hour.

</blockquote>

6

e.   Mechanical services for equipment repair prior to shipment would be at $35.00/man hour, with all parts supplied by Rush Industries.

12.   The Agreement did not expressly mention the duct work for the panel saw's dust collection system, spare parts, or tools.   It is undisputed that the extra equipment was not shipped to the Rush Industries facility in Americus.

13.   On December 8, 2006, Rush Industries sent MWP a check for $5,300.   The check contained the notation "Move Saw To Americus."   (Pltf. Ex. 10.)

14.   On December 15, 2006, MWP billed the total fixed amount for moving the panel saw from South Boston, Virginia, to Americus, Georgia, noting Rush Industries' partial payment of $5,300.   (Id.)   This invoice remains unpaid.

15.   Up until shipment on January 8, 2007, the panel saw remained in the D-Scan facility awaiting transport.   During this time, MWP made certain repairs to the panel saw, including to its carriage bearings and gears, at the request of Rush Industries.   These repairs were performed at the rates set forth in the Agreement and were apparently satisfactory, as no party has indicated otherwise.   During this time, D-Scan remained a separate entity from MWP, and there is no evidence that MWP had exclusive control over the panel saw or was in any way responsible for its condition.

7

16.  On January 8, 2007, MWP prepared an invoice to Rush Industries in the amount of $2,388.59 for the time and material repair work performed on the panel saw prior to shipment.  (MWP Ex. 11.)   This invoice was never sent before litigation developed between the parties, and it has not been paid.

17.  Unbeknownst to Rush Industries, MWP contracted with Brann's to physically transport the panel saw from South Boston, Virginia, to Americus, Georgia, using Brann's trucks.  MWP has used Brann's on multiple prior occasions to transport equipment and machinery.

18.  On January 8, 2007, MWP packed and loaded the panel saw onto two of Brann's trucks.  MWP did not request that Brann's tarp the panel saw during shipment, and Brann's did not do so because its regular policy, which the court finds was known to MWP, is to charge extra for tarping.  The weather was good, but the lack of tarping exposed the panel saw to the elements during transit.

19.  MWP issued an "Alternate Straight Bill of Lading – Short Form" ("Straight Bill of Lading") to Brann's to transport a "[s]aw, panel box, rails, [and] conveyers" to Americus, Georgia.  (MWP Exs. 12 and 12b.)  This Straight Bill of Lading incorporated the terms of the Uniform Bill of Lading, 49 C.F.R. pt. 1035, App. B.  (Id.)

20.  After MWP packed and loaded the panel saw onto Brann's trucks, Brann's transported it to Americus, Georgia, on air-suspension trailers, which reduce the road vibration to the cargo.

21.  All parties agree that during transit the plastic connectors on ten ribbon cables leading to the panel saw's computer were damaged.  This was likely from their being blown about in the wind during the trip.

22.  On January 8, 2007, the panel saw was delivered to Rush Industries' facility in Americus, Georgia.  The damage to the ribbon cable connectors was immediately observed, yet no other damage was noted.  There is no evidence that the damage to the ribbon cable connectors, in and of itself, reduced the value of the panel saw to scrap value at the point of delivery.

23.  Rush Industries accepted the panel saw with the damaged connectors, and MWP offered and agreed to locate new connectors.  Rush Industries directed MWP to assemble and install the panel saw in the Americus facility, which MWP did. Without the connectors, the panel saw was not operational.

24.  In January 2007, Mr. Rush contacted MWP at least twice to urge that it repair the connectors and make the panel saw operational.  Mr. Rush was motivated to have the repairs made because without the panel saw his business was unable to fulfill one or more large contracts.

25. On February 28, 2007, MWP sent Rush Industries a statement for the $4,000 balance owed for shipping the panel saw to Americus. (MWP Ex. 16.) The next day, Rush Industries refused to pay the amount owed until the saw was made operational and demanded full repairs within fifteen days. (MWP Ex. 17.)

26. On April 9, 2007, Rush Industries filed a lawsuit against MWP in North Carolina state court seeking damages related to the condition of the panel saw ("State Court Lawsuit").

27. Apparently unaware of the pendency of the State Court Lawsuit, Anthony Wilson, MWP's employee, telephoned Mr. Rush to advise him that (despite initially having been given the wrong product number by Rush Industries) he had been able to obtain new connectors once he got the right product number from Mr. Rush's wife. Mr. Rush, who was engaged at a trade show, answered the call but interrupted Mr. Wilson, saying that Rush Industries had filed a lawsuit against MWP and that any further communication should be directed to Rush Industries' attorney. Because of the pendency of the lawsuit, MWP ceased any efforts to offer the connectors to Rush Industries or to repair the panel saw.

28. Mr. Rush attempted to locate a used saw to replace the panel saw but was unable to find one. In May 2007, Mr. Rush

obtained two quotes for a new, comparable saw to replace the panel saw, which were for $349,970 and $236,490 (Pltf. Ex. 14), but they were more than the company could afford. Consequently, Rush Industries never replaced the panel saw.

29. According to Mr. Rush, beginning sometime in 2007 after the State Court Lawsuit was filed, Rush Industries sought out several companies and individuals to attempt to repair the panel saw. All indicated that they were either unable or unwilling to work on the saw without the connectors and/or electrical diagrams (which would show where to connect the ribbon cables).

30. On December 7, 2007, as the parties to the State Court Lawsuit attempted to mediate their differences, MWP delivered to Rush Industries the replacement connectors that Anthony Wilson had attempted to offer Mr. Rush earlier that year. However, Rush Industries determined that it could not attach the connectors to the existing ribbon cables, so it began searching for replacement ribbon cables. It located and purchased replacement ribbon cables on January 11, 2008, for a price of $103.60, plus $14.63 for shipping.

31. In January 2008, Rush Industries dismissed the State Court Lawsuit without prejudice and re-filed it as the present action, adding Brann's as a Defendant. This constituted the

11

first notice to Brann's that there was a problem with Rush Industries' panel saw.

32.  In January 2008, Rush Industries connected the replacement ribbon cables and replacement connectors to the panel saw.  Mr. Rush was informed that the control panel to the saw's computer lit up, but the "stop light" remained on and the computer did not display any programming or parameters. However, Mr. Rush was not present at this time and was not personally familiar with the state of the panel saw's computer or how it operates from a technical perspective; his testimony was based entirely on reports from his employees in Americus. By this time, the panel saw had sat unused and without power in the Americus facility for approximately one year.

33.  Subsequently, Rush Industries engaged in additional efforts to return the panel saw to an operational condition. However, Mr. Rush's testimony was general, and the three or four servicing companies he mentioned either said they were unable to work on the panel saw or did not recognize it.  Mr. Rush contacted a local electrician, who put Rush Industries in contact with someone in Germany who was to send a start-up disk for the computer, but it was never received.

34.  As part of its efforts to repair the saw, Rush Industries also attempted to re-boot the panel saw's computer. Mr. Rush indicated that in July of 2008 he had been informed

12

that the saw's computer had come up "98%." (MWP's Ex. 21.) It is unclear what this figure represents. Mr. Rush testified that he had no personal knowledge of Rush Industries' attempts to re-boot the saw's computer, was never present for such attempts (which were all performed by Rush Industries' personnel in Americus), and "wouldn't know" if the backup battery was good. To date, the panel saw has not been operational. Mr. Rush does not know why the panel saw will not operate and has no evidence of any specific defect or damage other than the damage to the connectors.

35. Rush Industries has never attempted to sell the panel saw and never investigated its salvage value. Based on MWP's estimate of $4,000 to disassemble the panel saw, Mr. Rush opined that its value in a non-operational condition is less than the cost to move it. Other than this opinion and the cost to purchase the ribbon cables, Rush Industries has submitted no evidence of the value of, or cost to repair, the panel saw.

## II. CONCLUSIONS OF LAW

1. The court's jurisdiction arises pursuant to the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 et seq., which preempts a shipper's state and common law claims against a carrier for loss or damage to goods during shipment. 5K Logistics, Inc. v. Daily Express, Inc., 659 F.3d 331, 336 (4th Cir. 2011) (noting that the Carmack Amendment has

13

"long been interpreted to preempt state liability rules pertaining to cargo carriage, either under statute or common law"). The court exercises its supplemental jurisdiction over MWP's counterclaim based on a state law claim for breach of contract. 28 U.S.C. § 1367(a).

2. Venue is proper pursuant to the Carmack Amendment, 49 U.S.C. § 14706(d)(1), which provides that in an action against a "delivering carrier," venue is proper in a federal judicial district "through which the defendant carrier operates." Here, both MWP and Brann's have their principal place of business in Roxboro, North Carolina, in the Middle District of North Carolina. As such, the Middle District of North Carolina certainly qualifies as the district "through which the defendant carrier operates."

**A. Application of the Carmack Amendment to MWP and Brann's**

3. The Carmack Amendment was designed to "create a national uniform policy regarding the liability of carriers under a bill of lading for goods lost or damaged in shipment." Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 706 (4th Cir. 1993). As such, the Carmack Amendment provides the exclusive remedy for damage to goods transported in interstate commerce by motor carriers and freight forwarders. 49 U.S.C. § 14706; Harrah v. Minnesota Mining & Mfg. Co., 809 F. Supp. 313, 317

14

(D.N.J. 1992). If cargo was shipped in interstate commerce by a "motor carrier" or "freight forwarder" as defined in the Interstate Commerce Act, the Carmack Amendment will preempt a shipper's state law claims and provide the exclusive remedy to the shipper. Adams Express Co. v. Croninger, 226 U.S. 491, 505–06 (1913); Mach Mold, Inc. v. Clover Assocs., Inc., 383 F. Supp. 2d 1015, 1029 (N.D. Ill. 2005).

4. This court has previously determined that the Carmack Amendment applies to Rush Industries' claims against Brann's. (Doc. 37 at 5.) Thus, the issue remains whether the Carmack Amendment preempts Rush Industries' state law claims against MWP. The answer turns on whether MWP is considered either a "freight forwarder" or "motor carrier" under the Carmack Amendment, as MWP asserts.

5. Under the Carmack Amendment, a "motor carrier" is defined as a "person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(a)(14). "Transportation" is in turn defined as including (1) "a motor vehicle . . . or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use," and (2) "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and

15

property." <u>Id.</u> § 13102(a)(23). This definition of "transportation" makes clear that liability under the Carmack Amendment extends beyond the carrier who actually provides physical transportation to a carrier providing services related to transportation of the goods. <u>See, e.g.</u>, 49 C.F.R. § 371.2(a) ("Motor carriers . . . are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport."); <u>Land O'Lakes, Inc. v. Superior Serv. Transp. of Wis., Inc.</u>, 500 F. Supp. 2d 1150, 1155 (E.D. Wis. 2007) (finding that the definition of "motor carrier" was satisfied when the defendant did not directly transport the shipment but arranged for another entity to broker the transport); <u>Mach Mold, Inc.</u>, 383 F. Supp. 2d at 1029 (noting that actual ownership of the vehicles used for the physical transport of the goods at issue is irrelevant in determining if an entity constitutes a "motor carrier" under the Carmack Amendment); <u>see also</u> <u>Travelers Ins. v. Panalpina, Inc.</u>, No. 08 C 5864, 2010 WL 3894105, at *5-6 (N.D. Ill. Sept. 30, 2010) (finding that company was a motor carrier when the delivery order established an obligation to transport the container and the company fulfilled that obligation by contracting with another company to make the delivery); <u>AIOI Ins. Co. v. Timely</u>

16

<u>Integrated, Inc.</u>, No. 08 Civ. 1479(TPG), 2009 WL 2474072, at *3 (S.D.N.Y. Aug. 12, 2009) (finding that the defendant qualified as a "motor carrier" because it arranged for shipment of the goods by contracting with a third party to provide the actual physical transportation, the court being persuaded by the fact that the defendant held itself out to the shipper as the carrier of the goods, that the agreement between the defendant and the shipper authorized the defendant to transport the goods, and that the defendant was legally bound to transport the shipment).

6. In this case, MWP is a "motor carrier" for purposes of the Carmack Amendment because, like the defendants in <u>Mach Mold, Inc.</u> and <u>AIOI Ins. Co.</u>, MWP held itself out to Rush Industries as the carrier of the goods and the Agreement authorized and legally bound MWP to transport the panel saw. (<u>See</u> Pltf. Ex. 9 ("Shipping coordinated by MWP will be at $1,300.00 per load").) That MWP failed to issue a bill of lading to Rush Industries has no effect on MWP's liability as a motor carrier or the application of the Carmack Amendment. <u>See</u> 49 U.S.C. § 14706(a)(1).

7. Because MWP is a "motor carrier" under the Carmack Amendment, any state law claims against it that arise out of damage occurring during the transportation of the panel saw are preempted. <u>See</u> <u>Mach Mold, Inc.</u>, 383 F. Supp. at 1029, 1032. Therefore, to the extent that Rush Industries' claims for breach

17

of contract, bailment, and negligence arise out of damage to the panel saw that occurred during transportation, they are preempted. See Shao, 986 F.2d at 705 (concluding that the Carmack Amendment preempts a shipper's state and common law claims for breach of contract and negligence for damage to goods by a carrier during interstate shipment); Werner v. Lawrence Transp. Sys., 52 F. Supp. 2d 567, 568-69 (E.D.N.C. 1998) (holding that the Carmack Amendment will preempt state law bailment claims).

8.   Although    the    Carmack    Amendment    defines "transportation" to include a variety of actions in connection with the transport of goods, such as "packing," "unpacking," and "storage," 49 U.S.C. § 13102(23)(B), Rush Industries concedes it has presented no evidence that damage to the panel saw occurred at any time other than during its actual transport while on Brann's' trucks.   Consequently, Rush Industries' claims for bailment, negligence, and breach of contract are preempted.[1]

---

[1] Under North Carolina law, bailment requires that a defendant exercise exclusive possession and control over property delivered to it.  U.S. Helicopters, Inc. v. Black, 318 N.C. 268, 347 S.E.2d 431 (1986).   In the instant case, these standards are not satisfied outside the time period in which Rush Industries' claim is preempted.   After MWP agreed on December 7, 2006, to service, remove, and transport the panel saw, it remained in the D-Scan facility.   There is no evidence that MWP had exclusive control or possession of the saw during this time; rather, D-Scan, which occupied the facility, had complete access to the facility and the panel saw.   See Merchants Terminal Corp. v. L & O Transport, Inc., No. SAG-09-cv-2065, 2012 WL 1416631, at *13-14 (D. Md. Apr. 20, 2012) (Stephanie A. Gallagher, M.J.) (finding that no

18

### B. Rush Industries' *Prima Facie* Case under the Carmack Amendment

9. MWP argues that the action should be dismissed because all claims raised by Rush Industries are preempted. (Doc. 48 at 11.) However, dismissal would be inappropriate in this case. When a claim under state law is completely preempted, as is the case here, a federal court should not dismiss the claim, but instead should re-characterize it as a claim under the applicable federal law. See <u>Darcangelo v. Verizon Commc'ns, Inc.</u>, 292 F.3d 181, 195 (4th Cir. 2002) (re-characterizing a state law breach of contract claim as a claim under § 502(a)(1)(B) of ERISA when the state law claim was preempted). This is especially true here, and MWP's argument is particularly suspect, because MWP removed the case on the very grounds that Rush Industries' claims arise under the Carmack Amendment. (Doc. 1 ¶ 3.) As such, Rush Industries' claims will be assessed under the provisions of the Carmack Amendment.

10. Under the Carmack Amendment, a motor carrier is liable to the shipper for damage to the goods occurring during transport without regard to the motor carrier's negligence. See 49 U.S.C. § 14706(a)(1); <u>Conair Corp. v. Old Dominion Freight</u>

---

bailment claim existed outside of a Carmack Amendment claim when the carrier did not have exclusive possession and control over the goods at issue). For the same reasons, no bailment claim can exist after the panel saw was unloaded and assembled in Americus, Georgia, because MWP did not have exclusive possession or control over it there.

Line, Inc., 22 F.3d 529, 531 (3d Cir. 1994). However, the plaintiff's recovery is contingent on the ability to establish a *prima facie* case under the Carmack Amendment's burden-shifting framework. See Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 926 (7th Cir. 2003). To do so, the plaintiff must establish (1) delivery of the goods to the carrier in good condition, (2) arrival in damaged condition, and (3) amount of damages. Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 138 (1964); Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294 (4th Cir. 1990). If the plaintiff establishes a *prima facie* case, the burden shifts to the carrier to show that it was not negligent and that the damage to the goods was caused by one of the following: (1) an act of God; (2) the public enemy; (3) the act of the shipper himself; or (4) the inherent vice or nature of the goods. Missouri Pac. R.R., 377 U.S. at 137-38.

### 1. Delivery of Goods to the Carrier in "Good Condition"

11. The first element of a *prima facie* case under the Carmack Amendment is proof of delivery of the goods to the carrier in good condition. Oak Hall Cap & Gown Co., Inc., 899 F.2d at 294. The plaintiff must establish this element by a "preponderance of the evidence." Fuente Cigar, Ltd. v. Roadway,

20

961 F.2d 1558, 1560 (11th Cir. 1992). Direct evidence is not required for a court to find that goods were delivered in "good condition." Id. Instead, a court may rely on circumstantial evidence to establish the original condition of the goods when the evidence presented is substantial and reliable. Fine Foliage of Florida, Inc. v. Bowman Transp., Inc., 901 F.2d 1034, 1038 (11th Cir. 1990).

12. A plaintiff need not present expert testimony of "good condition" in order to establish a *prima facie* case. See Am. Nat. Fire Ins. Co., 325 F.3d at 930 (finding that the plaintiff established that the goods were delivered to the carrier in "good condition" when the carrier's driver testified that the containers at issue were not damaged to the extent that it would indicate any freight was damaged at the time they were loaded for shipment); Center v. Roadway Express, Inc., No. 06-11168-DPW, 2008 WL 3824782, at *4 (D. Mass. Aug. 8, 2008) (finding that the plaintiff had presented sufficient evidence on the "good condition" element to survive summary judgment when the plaintiff presented testimony from a storage center manager that the machines at issue were in good working order before they were shipped).

13. In this case, Rush Industries has satisfied its burden of showing that the panel saw was delivered to MWP and Brann's in good condition. Specifically, Rush Industries' video shows

21

the panel saw functioning just a few weeks before it was loaded and transported by MWP. When the video was made, the panel saw was able to load, stage, and cut boards without any observable difficulty. Additionally, the video shows that the panel saw's computer was able to accept data and calculate schematics, which produced boards cut to the desired specifications on inspection. MWP's own witness, Mr. Criner, confirmed that the video reflected that the panel saw was working and that any apparent abnormality on the saw's computer screen was simply an artifact of the video-recording process.

14. MWP argues that there is no proof that the panel saw was in good condition between the time the video was taken and when Defendants received it to load for shipment. But Defendants overlook the fact that MWP was performing service on the saw during that time, and MWP's managing member, Mr. King, conceded that normal company protocol called for someone to note on MWP's worksheets if there had been a problem with any equipment being serviced; none was noted. Thus, even though the panel saw was approximately thirteen years old, it was in good working condition before it was shipped to Americus. Center, 2008 WL 3824782, at *4 (finding no genuine issue of material fact when plaintiff presented testimony that machinery was in good condition before shipment even though it had been originally manufactured in the 1940s and had sat in a storage

22

facility, unused, for the eight years prior to shipment); <u>Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.</u>, 102 F.3d 914, 917 (7th Cir. 1996) (finding that standard was met when shipper could not present any direct evidence regarding the condition of the specific goods at issue, but did establish reasonable inferences drawn from testimony about general procedures used by the plaintiff in preparing goods for shipment).

15. The Straight Bill of Lading also confirms that the panel saw was in good condition when it was delivered to MWP. A statement in a bill of lading as to "apparent good order" will constitute *prima facie* evidence that, as to parts which were open to inspection at the time of transport, the goods were in good order at the point of origin. <u>Accura Sys., Inc. v. Watkins Motor Lines, Inc.</u>, 98 F.3d 874, 878 (5th Cir. 1996). For parts of the goods that were not visible and open to inspection, a statement on the bill of lading that the goods were in "apparent good order" will constitute some evidence that the goods were in fact delivered to the carrier in good condition. <u>American Nat. Fire Ins. Co.</u>, 325 F.3d at 929. Here, the Straight Bill of Lading noted that the panel saw was received in "apparent good order" and lacked any identification of any apparent defect or problem. (MWP Ex. 12.) This further constitutes at least some evidence that the panel saw was in good condition prior to shipment.

16.  Moreover, neither Defendant has offered any persuasive evidence that reliably even suggests that the panel saw was not in good condition.

17.  As such, Rush Industries has satisfied the first element of a *prima facie* case under the Carmack Amendment.

### 2.  Arrival of the Goods in Damaged Condition

18.  The second element of a *prima facie* case under the Carmack Amendment is that the plaintiff must prove arrival of the goods in a damaged condition.  <u>Oak Hall Cap & Gown Co., Inc.</u>, 899 F.2d at 294.

19.  Both MWP and Brann's concede that when the panel saw arrived in Georgia, ten of its ribbon cable connectors were visibly damaged.  This was corroborated by the testimony of Mr. Rush and Mr. King.  <u>See</u> <u>Center</u>, 2008 WL 3824782, at *4 (finding that the "damaged condition" element was satisfied when the defendant conceded that the equipment was damaged, and this stipulation was corroborated by testimony and photographs); <u>Logistics Insight Corp. v. JDL Trucking, L.L.C.</u>, No. 04-40162, 2006 WL 374752, at *3 (E.D. Mich. Feb. 16, 2006) (finding that the "damaged condition" element was satisfied when there was testimony that the goods at issue were visibly broken).

20.  Thus, the second element of Rush Industries' *prima facie* case under the Carmack Amendment is satisfied to this extent.

24

21.    However,  Rush  Industries  also  claims  damage  to  the
complete  panel  saw  on  the  grounds  that  the  company  has  never
been  able  to  render  it  operational  since  it  was  delivered  by
Defendants.    In  support  of  this  claim,  Rush  Industries  notes
that,  upon  arrival,  the  panel  saw  could  not  be  operated  because
of  the  broken  connectors.    By  the  time  ribbon  cables  were
connected  approximately  one  year  later,  in  January  2008  (after
MWP  delivered  connectors  in  December  2007  and  new  ribbon  cables
had  been  purchased),  Rush  Industries  contends,  it  was  unable  to
boot  up  and  operate  the  saw's  computer.    According  to  Mr.  Rush,
he  attempted  to  contact  approximately  three  companies  to
investigate  the  problem,  but  they  either  declined  to  work  on  the
saw  or  stated  that  they  did  not  sell  the  equipment  anymore.    Mr.
Rush  also  contacted  an  individual,  Bob  Bullin,  to  locate  a
"start-up  boot  disk,"  but  it  was  never  sent  by  his  contact  in
Germany.[2]    Rush  Industries'  employees  also  made  some  unspecified
attempts  to  render  the  saw  operational.    As  a  result,  because
the  company  could  not  return  the  panel  saw  to  an  operational
condition,  Rush  Industries  contends,  it  is  worthless.

22.    The  court  finds  that  the  evidence  fails  to  demonstrate
that  the  panel  saw  arrived  in  a  damaged  condition  beyond  the

---

[2]    Mr.  Rush,  on  cross-examination,  conceded  that  he  cannot  recall  if  he
ever  received  a  backup  disk,  stating  that  "if  I  said  that,  I  am
repeating  somebody  else's  words."

patent damage to the connectors. Whatever efforts were made to restart the panel saw, Mr. Rush, Plaintiff's *only* witness at trial, was not present for them and based his understanding on what others had told him. And while Mr. Rush had experience generally in dealing with the equipment in his company's facilities, he lacked any training, education, or experience in the operation of the panel saw, or any like it, and thus could not testify as to the nature of the saw's failure to start. This led Mr. Rush to admit on cross-examination that he had no evidence of any damage other than to the connectors:

> Q:   Is there any other damage to the equipment other than to the plastic connector rings?
>
> A:   I have no idea.  I know it still doesn't work.
>
> *     *     *
>
> Q:   Sitting here today, do you have any knowledge whatsoever about any damage to the equipment other than to the plastic connectors?
>
> A:   No, I have no knowledge.  The machine has never functioned.  So for all I know, everything is set up right or set up wrong.  I never verified after the fact.  No.

Moreover, the passage of time from the delivery of the panel saw to Rush Industries' attempt to boot up its computer - almost a year - renders Plaintiff's claim that an unspecified latent damage existed at delivery even more remote and speculative. S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co., 695 F.2d 253, 260-61 (7th Cir. 1982) (rejecting claim where two

26

months passed from delivery and the witness was not qualified to determine whether the shipment was damaged). Plaintiff has failed to satisfactorily explain why, after such a long delay, the court should conclude that the damage nevertheless existed at the time of delivery. Based on the quality of the evidence and the credibility of the witnesses, the court finds that Rush Industries has not made a *prima facie* demonstration that its failure to render the panel saw operational represents damage that existed at the time of arrival.[3]

23. Further, Rush Industries has failed to make a *prima facie* demonstration that the damaged connectors or any delay of MWP in providing replacements caused the saw not to operate. While proof of damage in most cases can generally be established by lay testimony by someone knowledgeable about the good and its failure (e.g., broken glass, spoiled produce, lost items, and here – broken connectors), the problem becomes more difficult where some technical knowledge of the good is necessary to identify a latent damage, such as in the present case with regard to the panel saw and its computer. Here, Mr. Rush was simply not capable of testifying as to the nature of the saw's problem, if any, with any reliability to establish that it is in

---

[3]  This result would be the same even if, as Rush Industries contends, its state-law claims against MWP are not preempted by the Carmack Amendment.

fact damaged in its present condition or that it was damaged in any way beyond the damage to the connectors at the point of arrival.[4]

24. Accordingly, the "damage" to the panel saw for which recovery will be allowed is the replacement of the broken connectors and ribbon cables.

### 3. Damages

25. The final element of a *prima facie* case under the Carmack Amendment is that the plaintiff must prove the amount of damages. Oak Hall Cap & Gown Co., Inc., 899 F.2d at 294.

26. The Carmack Amendment imposes liability on carriers for the "actual loss or injury to the property." 49 U.S.C. § 14706(a)(1); 5K Logistics, Inc., 659 F.3d at 336. This language has been construed as adopting common law principles of damages. Camar Corp. v. Preston Trucking Co., Inc., 221 F.3d 271, 277 (1st Cir. 2000).

27. Generally, the appropriate measure of damages when goods are damaged in transit is the difference in value between the goods as delivered and their value had they not been damaged, Jessica Howard Ltd. v. Norfolk S. R.R. Co., 316 F.3d 165, 168-69 (2nd Cir. 2003), or the "repair costs occasioned by the harm," Camar Corp., 221 F.3d at 277. Although fair market

---

[4] For these reasons, the court need not reach Defendants' argument that Rush Industries failed to mitigate its damages.

value is generally used as the measure of damages, it is not the exclusive measure under the Carmack Amendment, Oak Hall Cap & Gown Co., 899 F.2d at 296, and a district court need not apply it over a more appropriate alternative. Brockway-Smith Co. v. Boston & Maine Corp., 497 F. Supp. 814, 820 (D. Mass. 1980) ("The general rule of market value less salvage, however, is not always the best measure of actual loss."); see also Oak Hall Cap & Gown Co., 899 F.2d at 296.

28. A plaintiff must ordinarily accept the shipment from the carrier and then proceed to mitigate its losses, unless the goods are worthless (i.e., "worthless for their intended purpose" or worth only their salvage value). Paper Magic Group, Inc. v. J.B. Hunt Transport, Inc., 318 F.3d 458, 463 (3rd Cir. 2003); Oak Hall Cap and Gown Co., 899 F.2d at 294-95. A carrier's responsibility extends only to the "full actual loss, damage, . . . caused by [it]." Missouri Pacific R.R., 377 U.S. at 137 (internal quotations removed). It is not an absolute insurer of the goods it transports. See Chicago & N.W. R. Co. v. Union Packing Co., 514 F.2d 30, 34 (8th Cir. 1975).

29. The only damage noted upon Rush Industries' acceptance of the panel saw was the damage to the ribbon cable connectors. There is no evidence that this damage, in and of itself, rendered the panel saw "totally worthless" at the time of delivery. Cf. Oak Hall Cap and Gown Co., 899 F.2d at 294-95

29

(finding that gowns shipped in interstate commerce were "totally worthless" when there was testimony from someone in the industry establishing that the goods, as damaged at the point of arrival, could not be sold in either a primary or secondary market, even with repairs).

30. Rush Industries argues that the saw's failure to start over a year after delivery was a reasonable consequence of the broken connectors and that the cost of a new replacement saw should be awarded because no other used saw could be found. Defendants contend that because MWP provided replacement connectors, only the cost of the ribbon cables should be awarded.

31. The court has already determined that Rush Industries has failed to demonstrate that the panel saw fails to operate as a result of any damage to the connectors. To the extent Rush Industries intends this argument to support a claim for consequential damages (which ordinarily relates to damages *apart* from those to the goods), however, it fails. Even if the court were to credit Mr. Rush's testimony that the one-year delay in connecting the panel saw's ribbon cables depleted the computer's backup battery and caused the computer's memory to be erased, there is no evidence that such damage was reasonably foreseeable at the time of contracting. See Air Prod. & Chems., Inc. v. Ill. Cent. Gulf R.R. Co., 721 F.2d 483, 485, 488 (5th Cir. 1983)

(noting that to recover consequential damages, the carrier must have notice or knowledge at the time of contracting of the special circumstances from which such damage would flow); Marquette Cement Mfg. Co. v. Louisville & Nashville R.R. Co., 281 F. Supp. 944, 948 (D. Tenn. 1967) (noting that the Carmack Amendment did not alter that common law – knowledge at the time of contracting is a prerequisite for recovery of consequential damages).

32. An award of the cost of a new panel saw on this record, moreover, would result in an enormous windfall and be inappropriate. First, Rush Industries has failed to demonstrate that the panel saw is totally worthless, i.e., damaged beyond the broken connectors and ribbon cables. Second, the panel saw and all its components were beyond their useful life. Even with servicing and repairs, the saw's remaining life was at best uncertain. The award of a new machine valued at twenty or more times the cost of the $14,300.00 panel saw, even if it had been shown to be unrepairable, would be unreasonable. See Houmani v. Roadway Exp., Inc., No. 3:07CV1552, 2008 WL 731497, at *1 (N.D. Ohio Mar. 17, 2008) (noting that the owner of damaged goods is not entitled to a windfall); Camar Corp., 221 F.3d at 279 (requiring that any award of damages have a rational basis in the evidence).

31

33. Rush Industries also argues that it suffered nominal damages for MWP's failure to deliver the duct work Mr. Rush negotiated to be included in the sale of the saw. However, Mr. Rush testified at trial that while he mentioned the duct work to MWP's representatives at the December 5, 2006 meeting at the D-Scan facility, he realized that MWP's proposal (MWP Ex. 9) failed to include the duct work in the items to be shipped. Mr. Rush further conceded that he realized that the Agreement he executed (Pltf. Ex. 9) only listed the panel saw to be shipped, which he conceded failed to include the duct work. This is consistent with the Agreement, which covers "all items in the following lot numbers specifically described in the Industrial Recovery [Services] auction listings: Panel Saw." (MWP Ex. 9.) The Industrial Recovery Services auction listing (Pltf. Ex. 1) does not include the duct work, tools, or parts. Therefore, while Mr. Rush discussed the duct work with MWP representatives, he failed to ensure it was included in the Agreement for shipment, and MWP is not liable for failing to deliver it.

34. Plaintiff's recovery will be confined to the damage to the ribbon cables and connectors noted at the point of delivery. No evidence was presented regarding the market value of the saw at the time of delivery and, even if it had been provided, the cost of repair is still the best measure of damages. See Houmani, 2008 WL 731497, at *1 (stating that a shipper's

32

compensation cannot exceed more than his injury, i.e., the actual loss to the cargo). Rush Industries indicated it incurred $118.23 to replace ribbon cables deemed necessary in order to reattach the connectors. As such, the only damages award that the court finds has a reliable basis in the evidence is $118.23.

### C. MWP's Defense under the Burden Shifting Framework

35. Because Rush Industries has established a *prima facie* case under the Carmack Amendment, the burden shifts to MWP and Brann's to show that they were not negligent and that the damage to the panel saw was caused by one of the following: (1) an act of God; (2) the public enemy; (3) the act of the shipper himself; or (4) the inherent vice or nature of the goods. <u>Missouri Pac. R.R.</u>, 377 U.S. at 137–38.

36. In this case, MWP has argued that the "inherent vice or nature of the goods" defense applies because the panel saw was past its useful life at the time that it was transported. Specifically, MWP contends that it is the inherent vice or nature of old and used equipment – especially the computer component – that it might not operate after disassembly, shipment, and re-assembly.

37. However, MWP's argument was tailored to respond to Plaintiff's claim for damages to replace the panel saw, not to the damage of the connectors and ribbon cables. Defendants have

33

tendered no argument that they were not negligent in causing the damage to the connectors and ribbon cables. Therefore, because the court has limited damages to the ribbon cables and connectors, it need not consider Defendants' inherent vice argument.

38. Consequently, the court finds that Defendants have failed to demonstrate any of their affirmative defenses, and Rush Industries is entitled to recover $118.23.

### D. Brann's Notice Defense

39. Brann's asserts that it is not liable to Rush Industries or MWP (by way of cross-claim)[5] for any damage to the panel saw during shipment because it was not timely notified of a claim pursuant to the terms of the Uniform Bill of Lading, 49 C.F.R. pt. 1035, App. B § 2(b).

40. Brann's Straight Bill of Lading incorporates the terms of the Uniform Bill of Lading, 49 C.F.R. pt. 1035, App. B. (MWP Ex. 12.) Pursuant to § 2(b) of the Uniform Bill of Lading, "[a]s a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after

_____

[5] MWP and Brann's have cross-claimed against each other for any damages awarded to Rush Industries. (See Doc. 7 (Brann's Eighth Affirmative Defense) and Doc. 8 (MWP's Fifteenth Affirmative Defense and Cross-claim).)

delivery of the property." 49 C.F.R. pt. 1035, App. B § 2(b). The primary purpose of this pre-suit claim requirement is to provide the carrier notice so it may conduct an independent investigation. Siemens Power Transmission & Distrib., Inc. v. Norfolk S. Ry. Co., 420 F.3d 1243, 1251 (11th Cir. 2005). Section 2(b)'s notice provision is a mandatory requirement, and a failure to comply with it will bar recovery. Miracle of Life, L.L.C. v. N. Am. Van Lines, Inc., 444 F. Supp. 2d 478, 483 (D.S.C. 2006) (gathering authority).

41.  Pursuant to 49 C.F.R. § 1035.1(a), only rail carriers and water carriers are obliged to use the terms of the Uniform Bill of Lading.  Motor carriers, like MWP and Brann's, are not bound by the provisions of the Uniform Bill of Lading unless they choose to be.  See C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc., 213 F.3d 474, 478 (9th Cir. 2000) (noting that motor carriers, unlike rail and water carriers, are not required to use the Uniform Bill of Lading, but the terms may nevertheless be incorporated if the carrier so chooses).

42.  In this case, Rush Industries contracted with MWP to service and ship the panel saw, and MWP in turn contracted its shipment obligation to Brann's.  In agreeing to ship the saw, Brann's issued a Straight Bill of Lading to MWP incorporating, for its protection, the pre-filing notice requirement contained

35

in the Uniform Bill of Lading. As between MWP and Brann's, therefore, the notice provision applies.

43. Keith Brann, Brann's president, testified that he was unaware that any damage had occurred to Rush Industries' panel saw until he was notified on January 25, 2008, that Rush Industries had filed a lawsuit. This was over a year after Brann's delivered the panel saw to the Americus facility, yet MWP had not submitted a written claim to Brann's during this time. Further, MWP was aware of the damage to the panel saw at the time of delivery and should have filed a written claim against Brann's. Because no such claim was filed, MWP is barred from recovering indemnity from Brann's. <u>Ryder Truck Lines v. Consolidated Rail Corp.</u>, 580 F. Supp. 22, 23 (N.D. Ill. 1984) (illustrating that the notice provision applies in indemnity actions between carriers); <u>see also</u> <u>S & H Hardware & Supply Co. v. Yellow Transp., Inc.</u>, No. 02-CV-9055, 2004 WL 1551730, at *2 (E.D. Pa. July 8, 2004) (noting that when a straight bill of lading incorporated the terms of the Uniform Bill of Lading, the filing of a written claim in the nine-month time period is "a strict condition precedent to the filing of a lawsuit").

44. As to Rush Industries' claim, neither party has directed the court to a case on point. In <u>Norfolk Southern Railway Co. v. Kirby</u>, however, the Supreme Court stated that "[w]hen an intermediary contracts with a carrier to transport

36

goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." 543 U.S. 14, 17 (2004); see also Great N. Ry. Co. v. O'Connor, 232 U.S. 508, 514 (finding that a cargo owner was limited by terms agreed to between an intermediary and a carrier because the carrier is entitled to assume that the intermediary had authority to agree upon the terms of shipment); Werner Enters., Inc. v. Westwind Mar. Int'l, Inc., 554 F.3d 1319, 1324 (11th Cir. 2009) (noting that Kirby is not limited to maritime law and applying it to a Carmack Amendment claim).

45. Here, Brann's agreed to transport the panel saw subject to the notice requirement it negotiated with MWP. Thus, Brann's was entitled to both rely on that requirement and to assume that MWP could agree upon Rush Industries' terms of shipment. Rush Industries is therefore barred from recovery against Brann's because it did not provide any written notice to Brann's within nine months of delivery.[6]

### E. MWP's Counterclaim Against Rush Industries

46. MWP has also counterclaimed against Rush Industries for the value of work performed under the Agreement. Specifically, MWP claims that Rush Industries never paid (1) the

---

[6] As noted by the Supreme Court, this result is not inequitable because Rush Industries can still recover against MWP, the party with which it initially contracted. See Great N. Ry. Co., 232 U.S. at 514–15.

$4,000 balance for shipping the panel saw to Americus and (2) $2,388.59 in pre-shipment repairs to the saw while it was in the D-Scan facility in South Boston (the cost of the repairs was invoiced January 8, 2007).

47.   The Agreement between MWP and Rush Industries provided that MWP would "disassemble, package, stage and load trucks" for the panel saw's shipment to Americus at a cost of $4,000. (Pltf. Ex. 9.)   The Agreement also provided that "[s]hipping coordinated by MWP will be at $1,300.00 per load estimated at 1 load." (Id.)   Even though MWP estimated that it would take only one load, it actually took two loads, yet MWP only charged $1,300.   Finally, MWP agreed to unload and assemble the panel saw in Americus for a cost of $4,000.   (Id.)   Thus, the entire contract cost for disassembling, packing, shipping, unloading, and assembling the panel saw in Americus was $9,300.

48.   Further, the Agreement also proposed that mechanical services related to the repair of the saw would be a $35.00/man hour.   (Id.)   Before the saw left the D-Scan facility in South Boston, MWP made repairs that Rush Industries requested, including replacing carriage bearings and gears, totaling $2,388.59.   (MWP Ex. 11.)   When considered with the above charges, therefore, the total amount Rush Industries incurred under the Agreement is $11,688.59.

38

49.  To date, Rush Industries has only paid $5,300 under the Agreement.  (MWP Ex. 10.)  Thus, Rush Industries is liable to MWP for $6,388.59 for the unpaid portion of its obligations under the Agreement.  The damage to the ribbon cable connectors does not excuse Rush Industries from performing its obligations under the Agreement with MWP.  Am. Nat. Fire Ins. Co., 325 F.3d at 932 (shipper accepting damaged goods still obligated to pay freight to carrier).

**F.  Brann's Cross-Claim Against MWP**

50.  Brann's has also filed a cross-claim against MWP for indemnity.  Because the court has found that MWP cannot seek indemnity from Brann's for failure to have provided proper notice, this claim is now moot.[7]

---

[7]  In the alternative, the court finds that Brann's would be entitled to indemnity from MWP based on the facts.  While the Carmack Amendment imposes special rules regarding a carrier's liability to a shipper of goods, ordinary rules of negligence are used to determine which of two carriers is liable for damage that occurred during shipment.  Am. Foreign Ins. Ass'n v. Seatrain Lines of Puerto Rico, Inc., 689 F.2d 295, 299 (1st Cir. 1982); Gordon H. Mooney, Ltd. v. Farrell Lines, Inc., 616 F.2d 619, 625 (2d Cir. 1980).  A carrier is "thus liable for damage caused by its breach of duty to use reasonable care in the transportation of the goods."  Am. Foreign Ins. Ass'n, 689 F.2d at 299.  Here, the evidence established that the damage to the connectors was most likely caused by a failure to have covered the load with a tarp.  The decision whether to tarp the load rested with MWP, which was also responsible under the Agreement for loading the saw.  And Brann's (with whom MWP has done much business in the past), had a known policy that it charged extra for that service.  Yet MWP failed to order a tarp for the shipment.  As such, MWP's negligence resulted in the damage to the panel saw's connectors, and MWP is responsible for it.

39

**G.    Prejudgment Interest**

51.  Rush Industries and MWP both seek prejudgment interest on their awards.   The basic purpose of prejudgment interest is to place the parties in the position they would have been in had they been paid immediately.   <u>Am. Nat. Fire Ins. Co.</u>, 325 F.3d at 935.   Ordinarily, interest accrues as of the date of the loss. <u>Id.</u>

52.  Here, Rush Industries' loss occurred on January 8, 2007, when the panel saw was delivered in a damaged condition. Interest will accrue at the federal legal rate under 28 U.S.C. § 1961 from that date.   <u>See</u> <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 314 F. Supp. 2d 201, 204 (S.D.N.Y. 2003) (finding that, in a case under the Carmack Amendment, prejudgment interest was appropriately calculated using the federal interest rate); 28 U.S.C. § 1961.

53.  MWP's interest is not so simply determined.   MWP invoiced Rush Industries on January 8, 2007 for installation of the panel saw.   However, the Agreement provides that payment for only "[r]epairs, [l]oading and [s]hipping" is due prior to shipment; otherwise, the balance is due "upon completion of installation."  (Pltf. Ex. 9.)   The installation of the panel saw was substantially completed, but for the broken connectors, by January 10, 2007.   Thus, prejudgment interest on the unpaid

40

$4,000.00 shall run as of that date.  Such prejudgment interest will be at 8% pursuant to N.C. Gen. Stat. § 24-1.

54.  MWP's other basis for recovery is the $2,338.59 for the service to the saw prior to shipment.  MWP created an invoice for this work by January 8, 2007, but Mr. King never sent it after delivery of the panel saw because of the ongoing effort to repair the broken connectors.  As such, the best date for assessing prejudgment interest is the date MWP sought payment.  On this record, that first occurred when MWP filed its counterclaim against Rush Industries on November 10, 2008.  Therefore, prejudgment interest accrue at the North Carolina legal rate of 8% as of November 10, 2008.

## III. CONCLUSION

For the reasons set forth herein, the court concludes that Rush Industries has established a *prima facie* case under the Carmack Amendment and is entitled to recover damages of $118.23 from MWP.  MWP has also established that it is entitled to recover $6,388.59 from Rush Industries for breach of the Agreement.  Further, Brann's has no liability to Rush Industries or MWP, because neither provided timely written notice of a claim.

IT IS THEREFORE ORDERED as follows:

Rush Industries shall have and recover $118.23 from Defendant MWP, with prejudgment interest at the legal federal

41

rate from January 8, 2007;

MWP shall have and recover $6,388.59 from Rush Industries under the Agreement, with prejudgment interest at the North Carolina legal rate of 8% accruing from January 10, 2007, on $4,000 of that amount, and prejudgment interest at the North Carolina legal rate of 8% accruing from November 10, 2008, on the remaining $2,338.59;

Brann's shall have no liability to Rush Industries or MWP in connection with the delivery of the panel saw.

A separate Judgment will issue.


                                    /s/    Thomas D. Schroeder
                                    United States District Judge

November 30, 2012